**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **NADINE A. VASQUEZ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 13 C 6222** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | **Magistrate Judge Mason** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Claimant Nadine A. Vasquez ("Vasquez" or "claimant") brings this motion for summary judgment [29] seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Vasquez's claim for disability insurance benefits under the Social Security Act (the "Act") 42 U.S.C. §§ Sections 416(i) and 423(d). The Commissioner filed a cross-motion for summary judgment [33], asking that this Court uphold the decision of the Administrative Law Judge ("ALJ"). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons set forth below, the claimant's motion for summary judgment is granted and the Commissioner's cross-motion is denied.

### I.   BACKGROUND

#### A.  Procedural History

On September 2, 2009, the claimant filed an application for disability insurance benefits under Title II and Part A of Title XVIII of the Social Security Act. (R. 158.)

Claimant alleged she became unable to work because of her disabling condition on June 29, 2008. (*Id.*) Her claim was initially denied on January 6, 2010, and again upon reconsideration on April 27, 2010. (R. 68, 69.) Thereafter, the claimant filed a written request for hearing on May 12, 2010 under 20 CFR 404.929 *et seq.* (R. 88-89.) The claimant appeared and testified at a hearing held on February 7, 2012 before ALJ Janice M. Bruning. (R. 41-67.) At the hearing, the claimant amended her alleged onset date of disability to November 1, 2008. (R. 62-63.) On May 10, 2012, ALJ Bruning issued a written decision denying claimant's request for benefits. (R. 20-32.) Claimant filed a timely Request for Review of Hearing Decision/Order on June 11, 2012. (R. 14.) On July 16, 2013, the Appeals Council denied this request, which made the ALJ's decision the final decision of the Commissioner. (R. 1-4.)

## B. Medical Evidence

### 1. Treating Physicians

#### a. Neck and Back Pain

On February 5, 2008, Vasquez presented to her primary care physician, Dr. Mark Gillis, with chronic lower back pain with right-sided sciatica. (R. 584.) She described the pain as dull and aching. (*Id.*) The pain limited her activity level, particularly walking. (*Id.*) Dr. Gillis noted that she was seen at Alexian Brothers Medical Center ("Alexian Brothers") on February 2, 2008 due to aggravated right-sided lower back pain and that her x-rays taken there were normal. (*Id.*) The x-ray report revealed no evidence of fracture or subluxation, but did note scoliosis concave. (R. 635.)

During a July 11, 2008 office visit, Vasquez reported that her back pain stemmed from two motor vehicle accidents that occurred in one day during her 20s. (R. 581.)

The pain had worsened over the past months.  (*Id.*)  Dr. Gillis documented that the pain banded across the lower back and included moderate spasms and radiation into the back and both legs.  (*Id.*)  Vasquez also reported occasionally experiencing tingling and weakness in her legs.  (*Id.*)  A July 18, 2008 MRI of her lumbar spine revealed findings of mild disc bulging at the L4/L5 vertebrae, resulting in mild narrowing of the central canal and right neural foramen.  (R. 365.)

Vasquez's first documented visit with pain management specialist Dr. John Prunskis was on August 27, 2008.  (R. 676.)  She described the pain as a 7-8 out of 10 in her bilateral lower back area as well as between her shoulder blades.  (*Id.*)  He performed a transforaminal selective nerve root block at L4 and L5 on the right side.  (*Id.*)  On September 10, 2008, Vasquez saw Dr. Prunskis and reported no changes in her pain since the last visit.  (R. 674.)  He performed another transforaminal selective epidural nerve root block at L4 and L5.  (*Id.*)  Vasquez saw Dr. Prunskis on September 22, 2008 for bilateral sacroiliac joint injections, which Dr. Prunskis noted helped with the pain.  (R. 673.)

A September 30, 2008 MRI of Vasquez's cervical spine revealed an impression of degenerative disc disease on the C5-C6 vertebrae, which was causing mild spinal stenosis.  (R. 364.)  Dr. Prunskis treated Vasquez on October 8, 2008, at which time she complained of intense, stabbing and shooting pain in her neck and lower back.  (R. 671.)  He prescribed her Vicodin in addition to her previous prescription of Neurontin.  (*Id.*)  He performed a cervical epidural injection on October 29, 2008, and five trigger point injections on November 19, 2008.  (R. 668-69.)

Vasquez went for an initial physical therapy evaluation on November 20, 2008, at which time she complained of constant neck and lower back pain that increased with prolonged standing, walking, and bending. (R. 323.) She also reported intermittent bilateral lower and upper extremity pain, numbness and tingling that increased with prolonged weight bearing activities. (*Id.*) Her therapist found that her symptoms were consistent with her diagnosis of neck sacroilitis and myofascial pain. (*Id.*) Vasquez attended seven physical therapy sessions between November 20 and December 5, 2008. (R. 315-16.)

On December 10, 2008, she saw Dr. Prunskis for bilateral sacroiliac joint injections. (R. 667.) He noted that her pain was a constant 7 out of 10 and increased her pain medicine. (*Id.*) Dr. Prunskis provided injection therapy on February 9, 2009, but noted that she was not responding to the treatment. (R. 666.)

On February 17, 2009, Vasquez was seen by Dr. Thomas McNally at Suburban Orthopaedics to assess whether she was a candidate for surgery. (R. 327.) She presented with right back and right neck problems. (*Id.*) She also noticed numbness in her anterior wrist and dorsal hand and fingers as well as in the posterior portion of her right leg. (*Id.*) She rated her pain between 8-10 out of 10 and stated that the epidurals in her lower back did not help and neither did physical therapy. (*Id.*) Dr. McNally noted that she reported a 20 pound weight gain. (R. 328.) X-rays from the visit showed decreased disc height and bone spurring, left sided scoliosis, and no fracture or instability. (R. 331.) She was diagnosed with cervical disc degeneration, spinal stenosis, and cervical spondylosis. (*Id.*) Dr. McNally documented that Vasquez requested surgery on her neck first, since the pain kept her up at night. (R. 332.)

An MRI on February 27, 2009 demonstrated cervical spondylosis at C5-C6 and a right paracentral protrusion, which appeared largely new compared to a previous exam. (R. 360.)  On March 5, 2009, Dr. McNally commented that Vasquez wished to discuss surgical options since she was not having significant relief with NSAIDs, pain medication, or interventional pain management.  (R. 333, 336.)  He determined that she was a good candidate for cervical disc replacement.  (*Id.*)  Dr. McNally also documented that Dr. Gillis was treating her for depression.  (R. 333.)

On March 23, 2009, Dr. McNally performed a C5-C6 total disc replacement "with complete anterior cervical discectomy with removal of posterior osteophytes and decompression of the neural elements."  (R. 392.)  No intraoperative complications were noted.  (*Id.*)  She had a post-surgery follow-up visit on April 2, 2009, at which time she denied any neck pain, stating that her pre-op posterior neck and shoulder blade pain had improved significantly.  (R. 338.)  She, however, continued to have back pain and also reported bilateral arm pain and numbness down her arms.  (*Id.*)  She reported that she felt about 75% better since before the surgery.  (*Id.*)  Her x-rays showed that the implant was in a good position and increased disc space height.  (R. 340.)

At an April 30, 2009 appointment with Dr. McNally, Vasquez reported that she was happy with the outcome of her surgery, although she still had some pain in the posterior aspect of her neck that kept her awake at night.  (R. 342.)  She had one episode of paresthesia to the right arm and leg and reported having some difficulty swallowing.  (*Id.*)  On June 4, 2009, Vasquez reported increased neck pain to Dr. McNally that she described as a 9 out of 10.  (R. 346.)  She also reported an exacerbation of her lower back pain.  (R. 348.)

A June 11, 2009 MRI of the lumbar spine found mild degenerative changes, especially involving the L4-L5 disc, but without associated mass effect.  (R. 554.)  On June 22, 2009, Vasquez presented to Dr. McNally with neck pain and lower back pain that radiated down her right leg.  (R. 350.)  She also experienced numbness and tingling in her right leg when walking or standing for a lengthy period of time.  (*Id.*)  Dr. McNally noted that a June 15 EMG of the bilateral upper extremities showed C5 root irritation of a mild degree and an incidental finding of left ulnar neuropathy across the elbow without denervating changes.  (R. 353, 556-57.)  He discussed options for the lower back pain, commenting that she was a candidate for decompression and fusion surgery because of her deformity and the spinal stenosis.  (R. 353-54.)  He referred her to Dr. Sapna Rathi, a neurologist who specialized in non-interventional pain management.  (R. 353.)

On July 6, 2009, Vasquez went to the ER at Alexian Brothers Medical Center, complaining of chest pain that began three days prior.  (R. 367, 369.)  Doctors concluded that the pain was due to a problem in the chest wall, likely caused by a minor bruise or muscle strain.  (R. 381.)  The following day, Dr. Gillis noted that her ER workup, including an EKG, chest x-ray, and lab work, was all negative.  (R. 576.)  Vasquez reported taking Indomethacin for her chronic neck and back pain and also stated that she was going to undergo a lumbar laminectomy with Dr. McNally in August.  (*Id.*)

Also on July 7, 2009, Vasquez had a neurologic consultation with Dr. Rathi.  (R. 517.)  Vasquez reported that she felt her neck surgery was a success, however, she still had chronic intermittent neck pain of a 5 out of 10.  (*Id.*)  Her lower back pain was described as a 10 out of 10, and she stated that she suffered from it all of her life.  (*Id.*)

Dr. Rathi administered bilateral sciatic nerve blocks, lumbosacral paraspinal muscle, trigger point, fascia, and right hip injections to treat the lower back and hip pain. (*Id.*)

Vasquez next saw Dr. Rathi on August 5, 2009. She told Dr. Rathi that she was contemplating surgery within the next few months, and noted that the injections were helping her a great deal. (R. 705.) Dr. Rathi refilled her Norco pain management prescription and gave her trigger point injections as well as bilateral sciatic nerve blocks and lumbosacral paraspinal muscle injections. (*Id.*) On September 23, 2009, Vasquez complained to Dr. Rathi of flare-ups of lower back pain with radiating symptoms down the lower extremities. (R. 513.) Vasquez attributed the increase in pain, which she rated a 10 out of 10, to increased activity, driving, and weather changes. (*Id.*) She reported using a back brace, but complained that it worsened her symptoms. (*Id.*) She did, however, feel that her current medication and injections helped her to function and perform her activities of daily living. (*Id.*) Dr. Rathi ordered a continuation of her medication and administered injections for the lower back pain. (R. 514.)

On October 7, 2009, Dr. Rathi noted that nerve conduction studies found decreased right medial motor nerve conduction velocities. (R. 543.) An EMG revealed carpal tunnel syndrome and mild right mid cervical radiculopathy, with both acute and chronic features. (R. 715.) Dr. Rathi continued her current medications and advised Vasquez to wear a wrist splint on the right hand. (*Id.*)

Dr. Rathi treated Vasquez on October 21, 2009, at which time she complained of flare-ups of her lower back pain and stated that her depression and anxiety also flared up due to her increased pain and insomnia. (R. 546.) She did not want to undergo a second surgery, instead wishing to continue with her current medications and injection

therapy.  (*Id.*)  Injections were administered at the appointment, and she reported

noticeable improvement.  (*Id.*)  On November 18, 2009, Vasquez saw Dr. Rathi for

bilateral occipital nerve blocks and trigger point injections.  (R. 698.)  She reported that

the injections helped and lasted three to four weeks, however her headaches had

increased due to stress.  (*Id.*)

Vasquez next saw Dr. Rathi on January 12, 2010, and complained of worsening

spasms and stiffness in her lower back.  (R. 696.)  Although she felt that the injections

were helping, she was contemplating surgery.  (*Id.*)  Dr. Rathi administered bilateral

sciatic nerve blocks for the back pain.  (*Id.*)  Vasquez had an appointment with Dr.

McNally on January 18, 2010, but she failed to attend it.  (R. 473, 696.)  On February

24, 2010, Vasquez presented to Dr. Rathi with a chief complaint of lower back pain with

radiating symptoms down both lower extremities.  (R. 695.)  An EMG revealed evidence

of mild-to-moderate mid/lower lumbar radiculopathy that was most prominent at the right

lower lumbar level and with acute and chronic features.  (R. 711.)  A March 5, 2010 note

from her gastroenterologist documented that Vasquez was a no show for the second

time.  (R. 476.)  Vasquez explained that she missed the appointment because she

suffered from depression and sometimes overslept.  (*Id.*)

On May 4, 2010, Vasquez saw Dr. McNally for the first time since her June 22,

2009 appointment.  (R. 1062.)  She wanted to discuss surgical options because of her

continued lower back pain and numbness and tingling.  (*Id.*)  They decided to obtain

new imaging before deciding on a specific treatment plan.  (R. 1064.)

Vasquez saw Dr. Rathi on April 7, 2010, and commented that her lower back

pain was better after the last set of injections, but that she had constant headaches and

a sore neck.  (R. 693.)  She also stated that she had an appointment with Dr. McNally for a possible lumbar discectomy or laminectomy.  (*Id.*)  Dr. Rathi refilled her medications and administered occipital nerve block injections for the headaches.  (*Id.*)  On June 2, 2010, Vasquez presented to Dr. Rathi complaining of pain all over.  (R. 707.)  She filled out a pain inventory form, which indicated that her pain continued to interfere with her general activity, mood, walking ability, relations with other people, sleep, and enjoyment of life.  (R. 729.)

On June 30, 2010, Vasquez was admitted to St. Alexius Medical Center's ER after having a grand mal seizure at home.  (R. 919.)  She had stopped taking her medication two days prior because her prescription ran out.  (*Id.*)  The doctors assessed it as a seizure possibly caused by opiate withdrawal.  (R. 920.)  A consultant met with Vasquez to discuss her opioid use and noted that Vasquez ran out of money for her pain medication.  (R. 921.)

On March 15, 2011, Vasquez saw Dr. McNally and reported that her neck pain had been better until the past month, but that she still felt better than before surgery.  (R. 1056.)  Her lower back pain continued and prevented her from sleeping.  (*Id.*)  Dr. McNally sought new imaging to better evaluate her cervical symptoms and referred her to St. Alexius Pain Clinic for an interventional pain management evaluation.  (R. 1059.)  She agreed to hold off on pain medications due to her seizure experience and to see how she responded to injections.  (*Id.*)  Between March 30, 2011 and May 5, 2011, Vasquez received three lumbar epidural steroid injections.  (R. 1067, 1078, 1081.)

On December 15, 2011, Vasquez complained to Dr. McNally of increased pain in her neck and lower back that radiated down to her shoulder blades and lower

extremities.  (R. 1222.)  Dr. McNally commented that in the two years since the total disc replacement, Vasquez "has done very well, but has had about one month of new neck pain and balance changes."  (R. 1225.)  He also noted that she continued to have lower back pain, although she had one month of relief with the lumbar epidural steroid injections.  (R. 1225-26.)  Since the pain was worsening, non-operative and operative treatment options were discussed.  (R. 1226.)

Vasquez was treated by Dr. McNally on March 13, 2012, and complained of increased lower back pain since the last visit.  (R. 1280.)  Dr. McNally ordered EMGs and imaging studies to better assess possible treatment options.  (R. 1283.)  She followed up with Dr. McNally on April 5, 2012.  (R. 1275.)  He commented that the recent EMG revealed electrophysiologic evidence of mild bilateral L4 chronic radiculopathy.  (R. 1277.)  Dr. McNally noted that while Vasquez had some recurrent neck pain, her primary concern was her lower back pain and right lower extremity radiculopathy.  (R. 1278.)  She felt that she exhausted conservative treatment options, and it was decided that she would proceed with bilateral L4-5 laminotomies as a treatment option.  (*Id.*)

### b.  Mental Health Issues

At her November 13, 2008 appointment with Dr. Gillis, Vasquez presented with profound depression and anxiety that had been getting moderately worse over time.  (R. 580.)  She stated that she had difficulty sleeping and was having panic attacks during the day.  (*Id.*)  She informed Dr. Gillis that she recently lost her job and was considering applying for social security disability benefits for the depression, which he noted "seem[ed] appropriate."  (*Id.*)  During a January 27, 2009 appointment with Dr. Gillis,

she commented that she had seen a therapist for her anxious depression, but was discharged after she was "doing better." (R. 579.) She expressed an interest in seeing a therapist again because she was feeling more hopeless and helpless. (*Id.*) Dr. Gillis changed her antidepressants and documented that her aggravated anxious depression was likely secondary to her chronic back pain. (*Id.*)

On November 13, 2009, Vasquez described feeling persistently depressed with poor daytime energy and frequent naps. (R. 574.) Dr. Gillis noted that Vasquez had a history of depression with anxiety and had been on Cymbalta, Zoloft, and Wellbutrin in the past. (*Id.*) Vasquez had a psychiatric diagnostic interview examination at Alexian Brothers Behavior Health Hospital on January 25, 2010, where she complained of depression, anxiety, and irritability. (R. 489.) She reported that it was hard to get out of bed, that she had no energy or motivation, and that her sleep was poor. (*Id.*) She was prescribed the following medications: Sertraline, Duloxetine, Lorazepam, and Doxepin. (R. 494.) It was noted that she complained of "depression for decades," and hypothesized that it was the result of her "chaotic living situation throughout childhood." (*Id.*) On February 23, 2010, Vasquez told Dr. Gillis that the medication was not working and that she had extensive anxiety, especially about going outside or driving. (R. 488.) She returned to Alexian Brothers Behavioral Health Hospital for further review of her medication on April 6, 2010. (R. 487.)

After her June 30, 2010 grand mal seizure, Vasquez was seen by Mary Davitt, APN, for a mental status examination. (R. 921.) Ms. Davitt reported that Vasquez's thought process was delayed and that she had some mild paranoid ideation. (R. 922.)

Vasquez was diagnosed with recurrent, moderate major depressive disorder, anxiety disorder, and pain disorder, with both medical and psychological factors. (*Id.*)

At her March 7, 2011 appointment with her new primary care physician, Dr. O'Connell, he noted that she "tested positive" for social anxiety, depression, generalized anxiety disorder, and attention deficit hyperactive disorder. (R. 1037.) During an April 8, 2011 appointment, Dr. O'Connell diagnosed Vasquez with sleep apnea, anxiety disorder not otherwise specified, and bipolar disorder. (R. 1034-36.) On June 16, 2011, Vasquez again met with Dr. O'Connell to assess her response to treatment; he changed her depression medication because it had been causing side-effects, but he noted that he needed prior approval on the new medication. (R. 1024.)

Vasquez underwent a comprehensive mental health assessment at the Kenneth Young Center on November 21, 2011. (R. 1243.) It was noted that while she was previously treated by her primary care doctor, she felt that she needed therapy. (*Id.*) Her activities of daily living were primarily described as having moderate functional impairments, requiring lower level of continuous paid support. (R. 1263.) She reported depression, significant anxiety, and "vegetative symptoms of amotivation, fatigue, anhedonia, excessive sleep, social isolation, feelings of hopelessness and worthlessness, passive suicide ideation, and neglect of basic daily tasks." (R. 1267.) Her therapist noted that she met the criteria for bipolar II disorder and panic disorder with agoraphobia. (*Id.*) She was referred for a psychiatric evaluation. (R. 1268.)

Vasquez was seen by Aaron Homan, MA, QMHP, at the Kenneth Young Center on several occasions between December 2011 and March of 2012 to adjust her medications and continue treatment for her mood disorder and panic disorder with

agoraphobia.  (R. 1228-38.)  Mr. Homan documented that Vasquez regularly presented with a depressed and/or anxious mood and that her goal was to be able to manage her own life.  (R. 1230-38.)  He commented that Vasquez was invested in her therapy.  (R. 1231.)  He also noted that Vasquez's coping skills included meditation and cleaning the house.  (R. 1233.)

At her psychiatric evaluation on February 9, 2012, Vasquez claimed she was "not functioning" and had been depressed since she was young.  (R. 1239.)  The psychiatrist, Dr. Jerry Gibbons, noted that she had little real psychiatric management in the past.  (*Id.*)  He did not believe that she had bipolar disorder because her more pressing problem was depression and not mood swings.  (R. 1241-42.)  She endorsed suicidal thoughts, but explained that she would not act on them because of her children. (R. 1241.)  Vasquez also endorsed almost all the symptoms of a manic or hypomanic episode while filling out a questionnaire and claimed the symptoms occurred for one or two days out of every six months.  (R. 1240.)  A March 8, 2012 progress note by Dr. Gibbons contained the following DSM IV diagnoses for Vasquez: mood disorder, unspecified affective psychosis, and panic disorder with agoraphobia.  (R. 1228.)

### 2.  Agency Consultants

On December 1, 2009, Vasquez underwent an Internal Medicine Consultative Examination for the Bureau of Disability Determination Services and a Psychological Examination for the Bureau of Disability Determination Services.  (R. 405, 411.)  The internal medicine consultant, Dr. Roopa K. Karri, noted that while her neck surgery was helpful, Vasquez still reported shooting pain from her lower back to both legs and that she had plans to see a neurosurgeon.  (R. 412.)

At the psychological examination, Vasquez claimed that she had been depressed since childhood.  (R. 405.)  She also reported that her neck surgery was unsuccessful and that she would need additional back surgery.  (*Id.*)  The doctor performing the assessment, Dr. Barbara F. Sherman, remarked that Vasquez gets along well with people, but did not socialize because of her orthopedic problems.  (R. 406.)  Vasquez reported that she was able to do light housekeeping such as cooking and washing the dishes, although she dropped dishes easily.  (R. 407.)  She also reported that she gained 30 pounds in the last few months because of her medication.  (R. 406.)

Vasquez described herself as severely depressed.  (R. 407.)  She explained that she was seeing a psychologist, but could not afford psychiatric care because she did not have medical insurance.  (R. 406.)  Dr. Sherman noted that Vasquez was irritable and yelled easily; cried because of the pain; had diminished focus and concentration; had difficulty sleeping and eating; and experienced passive suicidal ideations when not on her medications.  (R. 407.)

Dr. Marva Dawkins performed a psychiatric review.  (R. 416.)  In the review, Dr. Dawkins documented that Vasquez suffered from major depression.  (R. 419.)  Vasquez was noted to have moderate restrictions of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration.  (R. 426.)  Dr. Dawkins assessed her credibility and noted that her mental condition could not be expected to produce some of her symptoms to the degree alleged, finding that she tended to be more functional by self-report than she alleged.  (R. 428.)

Vasquez also underwent the Mental Residual Functional Capacity Assessment. (R. 430.) Dr. Dawkins performed the exam and opined that Vasquez was "not significantly limited" in most categories and only "moderately limited" in others. (*Id.*) Dr. Dawkins reported that Vasquez retained considerable functional capacity, as evidenced by the function reports, and that although she retained mental capacity to perform and sustain simple routine tasks in a work setting, she could probably not handle fast paced tasks or production quotas. (R. 432.)

Dr. Calixto Aquino provided the following Physical Residual Functional Capacity Assessment: Vasquez could frequently lift 10 pounds and occasionally lift less than 20 pounds; she could stand six hours in an eight hour day and could sit for the same; and she had no limitation on her push-pull ability, but had occasional limitations with ladders, stooping, or crouching. (R. 435-36.) Dr. Dawkins further noted limited handling/gross manipulation, no communication limitations, and no environmental limitations except to hazards. (R. 437-38.) Dr. Dawkins further remarked that "allegations partially credible as [claimant] has [medically determinable impairments,] however, allegations appear exaggerated slightly in light of objective MER [medical evidence of record]." (R. 441.)

### C. Claimant's Testimony

At the time of the hearing in front of the Administrative Law Judge on February 7, 2012, Vasquez was a 43-year-old woman who had completed one year of college. (R. 42-43.) She is 4'11" and weighs 150 pounds. (R. 42.) She is married with two children under the age of 18. (R. 42.) She testified that she had been laid off on June 29, 2008 and had not worked since then. (R. 44.) She collected unemployment for some time and looked for work through online job sites. (R. 43-44.) She would have tried to work

if given the opportunity, but she did not know if she would be able to because her pain medication limited her ability to drive and stay lucid.  (R. 58-59.)

Vasquez testified that the pain went from her neck down throughout her back. (R. 45.)  She always had pain in her legs and had pain in her arms while she slept.  (*Id.*) She described the pain as a "stabbing" through her back and a "tingling" in her legs. (*Id.*)  At the time of her testimony, she was not taking any pain medications because she had previously been addicted, causing a drug induced seizure in 2010.  (*Id.*)

She saw a mental health specialist once a week for her bipolar disorder and was taking medication for the same, prescribed by her family doctor.  (R. 47.)  Her therapist wanted her to increase her visits from once a week to twice a week, but she did not have enough money to pay for the gas to go that frequently because both she and her husband were out of work.  (*Id.*)  She was also scheduled to start seeing a psychiatrist once a month starting that week.  (*Id.*)  She reported seeing a therapist "on and off" since she was 15.  (R. 47-48.)

Vasquez testified that she experienced low self-esteem, memory loss, and difficulty thinking, concentrating, and focusing.  (R. 48.)  She attributed the memory loss to her pain medication.  (*Id.*)  She also reported crying spells at least once a week, "when the stress gets too much."  (*Id.*)  The medication helped with the depression, but not with the stress and crying spells.  (*Id.*)  She testified that she had an increased desire to kill herself because her pain was getting worse.  (*Id.*)  She also had paranoia about people watching her and experienced panic attacks when she went outside.  (R. 48-49.)  The panic attacks began around 2009, and she could usually talk herself through them by going back inside.  (R. 49.)

Vasquez testified that she does not go outside, shopping, or to school events, and that her husband does all of that for her. (*Id.*) She stated she had difficulty with personal care, such as putting on shoes and getting into the bathtub. (R. 53.) She testified to driving "as little as possible," about once a week to the corner store. (*Id.*) She stated that she was reliant on her family to perform many chores, noting that her husband did the laundry, dusting, and vacuuming and her son did the dishes and took out the garbage. (R. 54.) She was able to cook if it involved microwaving. (*Id.*) Her husband also helped the kids get ready for school. (*Id.*)

She also testified that she did not go out to eat, read, or walk the dog, but that she did watch television shows and went on the computer for five minutes a day. (R. 56.) She stopped going outside at least once a day within the past year and a half. (R. 57.) Vasquez testified that she was unable to get through the day without taking a nap. (R. 59.) She explained that she spent the majority of the day in bed due to the combination of depression and back pain. (R. 60.)

Vasquez testified that since 2010, she could not walk more than a block before she had to sit down and rest, and that she could only stand for about ten minutes, or half an hour "on and off." (R. 50-51.) She recently bought a cane to help her walk, but she left it at home because she was embarrassed to use it. (R. 52.) Vasquez reported that she could sit for about half an hour. (R. 51.) She also reported being able to lift less than a gallon of milk at a time. (*Id.*)

Vasquez was aware that doctors said her case was mild and that her back pain "shouldn't really hurt;" however, she emphasized that it did hurt. (R. 57.) She also testified about her surgical options, explaining that the risk with doing surgery on her

back was that it might shift her spine.  (*Id.*)  She explained that she missed most doctors' appointments because she was afraid to leave the house, but her husband forced her to go to her doctors' appointments because she was in so much pain.  (R. 61.)

She further testified that it was near impossible for her to leave the house almost every day, but she could try to force herself to leave three out of five times a week.  (R. 62.)  She testified that she would be unable to perform the tasks of a receptionist for seven hours a day, five days a week.  (R. 61.)  People irritated her and she was afraid to leave her house.  (*Id.*)

### D. Vocational Expert's Testimony

Aimee Mowery testified as the vocational expert ("VE") at the hearing.  (R. 63.) Ms. Mowery reviewed exhibits and heard testimony regarding plaintiff's work history. (*Id.*)  She testified that Vasquez previously worked as an ophthalmology assistant, a sedentary and skilled position; a lead or head teller at a bank, a skilled occupation; and a supervisor of tellers, a sedentary and skilled occupation.  (R. 64.)  Vasquez described performing all positions at a medium exertional level.  (*Id.*)

The ALJ asked the VE to consider an individual of a specified age, education, and work experience, who could lift and carry 10 pounds occasionally, less than 10 pounds frequently; stand or walk a total of two hours during an eight-hour work day; sit at least six hours during an eight-hour work day; would be limited to two to three step, repetitive, routine tasks; and could not come into contact with the general public for work-related purposes but could come into contact with coworkers and supervisors.  (R. 64-65.)  The ALJ asked the VE whether such an individual would be able to find work in

the local economy. (*Id.*) The VE testified that such an individual could perform an unskilled, sedentary job, such as a sorter (1,008), hand packager (1,088), or an inspector check weigher (1,098). (*Id.*)

The ALJ next asked the VE to consider whether the same hypothetical individual could work if she was required to use a cane as needed to get to and from the work station. (R. 65.) The VE answered negatively, stating that there would be no occupations that the hypothetical individual who required access to a cane could perform. (*Id.*) When asked why the cane would limit her options, the VE clarified that due to the public contact, the hypothetical individual would be unable to perform the unskilled, sedentary occupations.[1] (R. 66.)

The ALJ asked the VE to consider whether the same hypothetical individual could work if she was off task 20 percent of the work day due to the need to nap or lie down. (*Id.*) The VE answered negatively, stating that there would be no occupations that would allow the individual to be off task 20 percent of the day. (*Id.*)

## II.    LEGAL ANALYSIS

### A.  Standard of Review

The Court should affirm the decision of the ALJ if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g), *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is greater than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). We must consider

---

[1] The VE does not clarify why the cane would increase Vasquez's public contact or why the increased public contact would make it impossible for her to work.

the entire administrative record, but will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (quoting *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir.2000)). This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (quoting *Steele*, 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," she "must build an accurate and logical bridge from the evidence to [her] conclusion." *Clifford*, 227 F.3d at 872. The ALJ must "sufficiently articulate her assessment of the evidence to assure us that the ALJ considered the important evidence… [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (quoting *Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir. 1985)).

Reversal is required regardless of evidentiary support if the ALJ commits a legal error. *Lopez*, 336 F.3d at 539. The ALJ commits legal error by failing to comply with the Commissioner's rulings and regulations. *Prince v. Sullivan*, 993 F.2d 598, 602 (7th Cir. 1991).

## B. Analysis under the Social Security Act

In order to qualify for disability insurance benefits or supplemental security income, a claimant must be labeled "disabled" under the Social Security Act. A person is disabled under the Act if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last

for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: (1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disability impairment, whether she can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The claimant has the burden of establishing a disability at steps one through four. *Ruiz v. Barnhart,* 518 F. Supp. 2d 1007, 1021 (N.D.Ill. 2006). If the claimant reaches step five, the burden then shifts to the Commissioner to show that the "claimant is capable of performing work in the national economy." *Id.*

The ALJ followed this five-step analysis. At step one, the ALJ found that the claimant had not engaged in substantial gainful activity since the alleged onset of the disability. (R. 22.) At step two, the ALJ found that claimant had the following severe impairments – history of cervical disc displacement surgery, lumbar radiculopathy, obesity, headaches, depression, anxiety, panic disorder, and history of opiate overuse. (*Id.*) The ALJ noted that the claimant had been diagnosed with a number of conditions describing her lower back pain and cervical disorder/pain, but found that claimant's history of cervical disc displacement surgery and lumbar radiculopathy were the most consistently diagnosed and treated conditions. (*Id.*) She also found that claimant had several impairments that were not severe, such as claimant's isolated chest pain, obstructive sleep apnea, an isolated seizure, hemorrhoids, asthma, and irritable bowel

syndrome.  (R. 23.)  At step three, the ALJ determined that claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (*Id.*)  Next, the ALJ found that the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a); however, the claimant required the option to stand for 1-2 minutes after sitting for 45 minutes; could not climb ladders, ropes or scaffolds; could only occasionally balance, stoop, crouch, kneel, crawl, or climb ramps/stairs; was limited to only frequent handling with the right upper extremity; and had to avoid concentrated exposure to work hazards (such as heights and dangerous moving machinery).  (R. 25.)  Furthermore, the claimant was limited to performing 2-3 step, simple, routine, repetitive tasks; could not tolerate contact with the public; and could tolerate only occasional contact with co-workers and supervisors.  (*Id.*)  At step four, the ALJ found the claimant was unable to perform any past relevant work.  (R. 30.)  However, at step five, the ALJ found that there were jobs which exist in significant numbers in the national economy that the claimant could perform.  (*Id.*)

Vasquez argues that the ALJ erred in her assessment of Vasquez's credibility and RFC.  (Plaintiff's Brief at 11.)  She also argues that the ALJ failed to properly analyze claimant's daily activities and obesity.  (*Id.* at 17.)  Vasquez further contends that the ALJ failed to properly analyze her mental impairments by underestimating the severity of claimant's condition, by failing to analyze the impact of claimant's GAF score, and by assigning considerable weight to the opinion of a State Agency psychologist who did not have access to updated treatment notes.  (*Id.* at 20.)  We address each of Vasquez's arguments below.

## C. The ALJ's RFC Determination and Credibility Determination are Not Supported by Substantial Evidence.

Claimant contends that the ALJ's RFC determination is not supported by substantial evidence and that her reasons for discounting credibility are flawed. The Commissioner responds that substantial evidence supports the ALJ's credibility and RFC findings. On these points, we agree with Vasquez.

To succeed on this ground, claimant must overcome the highly deferential standard that we accord credibility determinations. *See Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). We will reverse an ALJ's credibility determination only if the claimant can show that it was "patently wrong." *Id.* However, although judicial review of the decisions of administrative agencies is deferential, it is not abject. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (quoting *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002)). The Court cannot uphold an administrative decision that, because of contradictions or missing premises, "fails to build a logical bridge between the facts of the case and the outcome." *Parker*, 597 F.3d at 921 (quoting *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009)).

Under SSR 96-7p, "the ALJ's assessment of the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on [her] ability to function must be based on a consideration of all the evidence in the case record," including "medical signs and laboratory findings." SSR 96-7p at *5; *Unger v. Barnhart*, 507 F. Supp. 2d 929, 941 (N.D.Ill. 2007). In this case, the ALJ failed to consider the numerous doctor's reports, MRIs, and x-rays that corroborated Vasquez's claim of severe, continuous pain.

The ALJ's credibility determination addresses several inconsistencies she finds in claimant's testimony and within the medical records. (R. 29.) Specifically, the ALJ found that claimant reported to the medical consultative examiner that she obtained considerable relief from neck surgery but reported to the psychological consultative examiner on the same day that her surgery was unsuccessful and that she obtained no relief. (*Id.*) Claimant reported engaging in considerable physical activities at one point and testified at a later date to an almost complete inability to function physically. (*Id.*) Additionally, the claimant received unemployment compensation during the first and second quarters of 2010, which to the ALJ proved that Vasquez was "ready, willing, and able to work." (*Id.*) Both of the State Agency consultants maintained the claimant had credibility issues as well. (*Id.*) The ALJ concluded that the claimant was not credible because her "testimony [was] not consistent with either the medical evidence of record or her reported activities of daily living." (*Id.*)

The Seventh Circuit has addressed cases in which the claimant is denied benefits because of credibility issues. *Parker*, 597 F.3d at 921-22; *Spiva v. Astrue*, 628 F.3d 346 (7th Cir. 2010). In *Spiva*, the ALJ had based his opinion on a doctor who originally claimed Spiva might be "malingering," but later decided he was not. *Id.* at 351. Judge Posner mentioned that "nothing in the treatment notes suggested that Spiva was being deliberately or strategically vague or evasive" and that the nature of Spiva's affliction was likely to result in vague statements. *Id.* He concluded that the ALJ's assessment of Spiva's lack of credibility was not founded and remanded the case. *Id.*

In this case, the ALJ relied heavily on the conclusion of the State agency psychological consultant. The ALJ discounted the validity of Vasquez's self-reported pain because of her "documented addiction" to narcotic pain medication. However, Vasquez's regular physicians never suggested in their notes that her reports of pain were due to narcotic seeking behavior and always treated her medically verifiable symptoms as real. Modifications to treatment were regularly made as necessary based on Vasquez's complaints. Additionally, there was no suggestion that Vasquez's pain was greater than would be expected from the numerous issues shown in her x-rays and other medically objective tests. When Vasquez told her doctor that she would seek disability, he noted that it "seem[ed] appropriate." (R. 580.) Just as in *Spiva*, nothing here suggests that Vasquez was deliberately attempting to magnify her pain. Moreover, Vasquez produced MRIs and x-rays that showed the problem areas that caused her reported pain.

The ALJ based her decision in part on Vasquez's reports that her surgery was successful and also that she was experiencing continued pain, finding that these statements were inconsistent. The ALJ, however, does not acknowledge that the surgery was to treat her neck pain, and there was no indication that the surgery would treat her lower back pain. Consequently, Vasquez's comments regarding her improved neck pain but increased back pain were reasonable. In the first post-operative appointment, Vasquez reported continued pain and radiating symptoms down her arms and stated that the surgery was about 75% successful.

The ALJ's assessment of claimant's "considerable" physical activities and chores are addressed more fully in the next section, but we now address the ALJ's credibility

assessment based on select social functioning records. The ALJ claimed that Vasquez's social function was, at most, moderately limited, citing that she attended appointments, went shopping, attended church, used Facebook, and spent time with her family. Vasquez, however, testified that she frequently missed appointments and that her husband had to force her to go to appointments, which is supported by the medical records. In her April 2010 Function Report, Vasquez noted that she went to church or grocery shopping a few times a month. More recently, however, in her February 7, 2012 testimony, Vasquez said she no longer attended church and that she did not go out to eat, to concerts, ball games, or the movies. The ALJ found these statements to be inconsistent, instead of considering that her condition may have deteriorated.

The ALJ also pointed out that Vasquez did not regularly seek treatment for her mental health issues. The ALJ failed to acknowledge claimant's comments that her primary care physician was, at times, providing her with mental health treatment. Claimant also testified that she was unable to attend more therapy sessions because she could not afford all of the gas while both she and her husband were unemployed. The record also establishes financial difficulties through documentation of cars being repossessed and her gas being turned off. The Seventh Circuit has held that the ALJ must first consider the reasons for lack of treatment before drawing a negative inference. *Craft v. Astrue,* 539 F.3d 668, 679 (7th Cir. 2008). Courts have also determined that the inability to afford treatment constitutes a good reason for not receiving it. *See, e.g. SSR 96-*7p, 1996 WL 374186, at * 8; *Shauger v. Astrue,* 675 F.3d 690, 696 (7th Cir. 2012). The ALJ, however, never considered the reasons for limited

mental health treatment and assumed that claimant must be exaggerating her mental health problems.

With respect to the ALJ's issue with claimant's collection of unemployment, the Seventh Circuit has noted that claimants may seek unemployment benefits because they are desperate and have no other source of income. *See Gentle v. Barnhart,* 430 F.3d 865, 867 (7th Cir. 2005); *Richards v. Astrue,* 370 Fed. Appx. 727, 731 (7th Cir. 2010). While it is appropriate for the ALJ to consider representations claimant made about an ability to work, here, the ALJ did not consider all the factors that led Vasquez to seek unemployment. Given the claimant's evidence of financial difficulties, the ALJ should have at least considered this as part of her credibility determination. The ALJ cannot selectively consider various treatment notes from the record without taking all of the records into consideration. *Myles v. Astrue,* 582 F.3d 672, 678 (7th Cir. 2009). The ALJ's belief that the claimant was not credible is not consistent with the medical records or testimony; consequently, the ALJ failed to consider the full record when assessing the claimant's condition.

The RFC is the most a claimant can still do despite her limitations. 20 C.F.R. § 416.945(a)(1). In making the RFC determination, the ALJ will consider all of the relevant medical and other evidence in the record, including evidence of impairments that are not severe. 20 C.F.R. § 416.945(a)(3); *Craft,* 539 F.3d at 676. The RFC assessment must contain a narrative discussion describing how the evidence supports the ALJ's conclusions and explaining why any medical source opinion was not adopted if the ALJ's RFC assessment conflicts with such an opinion. SSR 96-8p, 1996 WL 374184, at **5, 7; *accord Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). A

court will uphold an ALJ's decision "if the evidence supports the decision and the ALJ explains his analysis of the evidence with enough detail and clarity to permit meaningful review." *Arnett v. Astrue*, 676 F.3d 586, 591-92 (7th Cir. 2012) (*citing Eichstadt v. Astrue*, 534 F.3d 663, 665-66 (7th Cir. 2008)). "Although an ALJ need not mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion; in so doing, he may not ignore entire lines of contrary evidence." *Arnett*, 676 F.3d at 592.

Here, the ALJ concluded that Vasquez, among other things, maintained the RFC to perform sedentary work, except that she required the option to stand for 1-2 minutes after sitting for 45 minutes. In fashioning this RFC, the ALJ reviewed various medical records, the opinions of the consulting physicians and examiners, and her treating physicians. As discussed above, she also reviewed claimant's own complaints, but found the complaints inconsistent with certain portions of the record.

While the ALJ is not required to discuss every piece of evidence in the record, the ALJ must connect the evidence to the conclusion. *See Arnett*, 676 F.3d at 592. Here, the ALJ dedicated a substantial amount of time addressing claimant's credibility and discounting some of her complaints of pain and her limitations. In her RFC assessment, the ALJ's credibility concerns limited her assessment of certain evidence that could play a role in claimant's RFC. For instance, the ALJ does not address claimant's frequent need to nap or lie down and the fact that the VE testified that there would be no occupations for an individual who would require time to lie down during the work day. The ALJ also does not explain her conclusion that the claimant requires the option to stand for 1-2 minutes after sitting for 45 minutes. Such a scenario was not

reflected in the medical record, nor was it posed to the VE as a requirement during the ALJ's line of questioning. On this record, we are left wondering if the ALJ properly considered any and all limitations caused by Vasquez's impairments, even those the ALJ did not find as credible.

Therefore, the ALJ's conclusion that Vasquez was functioning normally is contradicted by some of the evidence. The ALJ did not assess the consistencies within the medical records when making her credibility determination. Moreover, the ALJ did not consider that the passage of time may have been the reason for different statements as opposed to an exaggerating claimant. We remand this matter to the ALJ for review consistent with this finding.

### D. The ALJ Did Not Sufficiently Analyze Claimant's Daily Activities and Obesity.

The ALJ must also determine whether the claimant has an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR 404.1520(d), 404.1525, or 404.1526. The ALJ concluded that the evidence did not establish that the claimant's impairments, either alone or in combination, met or equaled the severity of any impairments set forth in the listed appendices. Claimant argues this conclusion was in error. We agree.

With respect to Vasquez's daily activities, the ALJ commented that Vasquez reported light housecleaning, caring for her children, caring for pets, preparing meals, going shopping, managing money, playing games with her children, and using a computer. The ALJ, however, fails to acknowledge that Vasquez testified that she rarely goes shopping, she is only able to do the dishes a few at a time before taking a break, and she only uses the computer for five minutes a day. Vasquez admitted that

when she did chores, she had to split them up over several days or rest and take a nap between individual tasks.  The record further showed that Vasquez relied on her husband and children to perform her daily tasks, and while she admitted she could make a sandwich or microwave dinner, she typically ordered out.  The ALJ did not explain why she did not factor in the statements given years later, when it was reasonable to suspect that claimant's condition may have deteriorated.  *See Roddy v. Astrue*, 705 F.3d 631 (7th Cir. 2013) (finding that the ALJ erred by considering activities as inconsistent and failing to properly consider that the claimant's condition had deteriorated in the interim); *see also Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000) (finding that the ALJ failed to properly consider claimant's deteriorating condition).  Additionally, the ALJ continued to selectively rely on the record when she cited claimant's ability to attend appointments and ignored the records indicating her missed appointments.

Furthermore, the ALJ noted that the above listed appendices provide guidance regarding a diagnosis of obesity in the adjudication of disability claims.  The Act outlined its policies regarding the role of obesity in disability claims by Policy Interpretation Ruling SSR 02-1p.  SSR 02-1p requires the ALJ to consider obesity in determining whether an individual has a medically determinable impairment.  SSR 02-1p, 2002 WL 34686281.  If there is no diagnosis of obesity but the evidence includes clinical notes or other medical records showing consistently high body weight, the ALJ should either consult a medical source or, as is done in most cases, use her judgment "to establish the presence of obesity based on the medical findings and other evidence in the case record."  *Id.*  Whether the combined effects of obesity with the other impairments can be

greater than the effects of each impairment considered separately is also to be considered. *Id.*

Here, the medical records demonstrate that claimant was obese throughout the applicable period. On April 28, 2011, she was 4' 11" and 160 pounds, a BMI of 32.3. On more than one occasion, the medical records note that she experienced significant weight gain (over 20 pounds) as a result of her medication. However, while the ALJ acknowledged that Social Security Ruling 02-01p provides guidance regarding a diagnosis of obesity and stated that obesity was a severe impairment that claimant suffered from, she did not properly consider claimant's obesity. The ALJ should have evaluated whether claimant's alleged obesity constituted a medically determinable impairment in accordance with SSR 02-1p and whether it increased the severity of other impairments.

While the ALJ's limited obesity evaluation alone may not be cause for remand, the ALJ should further analyze claimant's obesity on remand. For the reasons stated above, on remand, the ALJ should further analyze the realities of Vasquez's daily functioning based on the entirety of the record.

### E. The ALJ Did Not Sufficiently Assess Claimant's Mental Impairments.

Claimant next argues that the ALJ failed to properly consider her mental impairments. In cases where the claimant presents evidence that he or she suffers from a mental impairment, the ALJ must follow a "special technique" prescribed by the regulations. 20 C.F.R. §404.1520(a)(a); *see also*, *Keys v. Barnhart*, 430 F. Supp. 2d 759, 772 (N.D. Ill. 2006). The ALJ is required to document application of the technique in her decision. 20 C.F.R. §404.1520a(e), *Keys*, 430 F. Supp. 2d at 772. The ALJ's decision must include a specific finding as to the degree of limitation in each of the

functional areas described in paragraph (c), located at 20 C.F.R. §404.1520(a)(c)(3). Paragraph (c) identifies "four broad functional areas in which [the ALJ] will rate the degree of [the claimant's] functional limitation, activities of daily living, social functioning, concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. §404.1520(a)(c)(3). After this analysis is performed, if the ALJ finds that the mental impairments are severe, she must determine if they are equivalent in severity to a listed mental disorder. 20 C.F.R. §404.1520(a)(d)(2). If a severe mental impairment is found that neither meets nor is equivalent in severity to any of the listed disorders, the ALJ should then assess the claimant's residual functional capacity. 20 C.F.R. §404.1520(a)(d)(3).

The ALJ found that the severity of the claimant's mental impairments did "not meet or medically equal the criteria of listings 12.04, 12.06, or 12.09." (R. 24.) She concluded that claimant only had a mild functional limitation in the activities of daily living because claimant reported performing light housecleaning, caring for her children, and getting them to school. She concluded that claimant had at most a moderate limitation in maintaining social functioning. She also found that claimant had a moderate limitation in concentration, persistence, or pace "primarily due to her complaints of pain." (R. 24.) Finally, the ALJ concluded that the claimant had experienced no episodes of decompensation of extended duration.

As discussed above, some of the ALJ's assessment is contradicted by claimant's testimony as well as the medical records. For example, the ALJ mentioned that "claimant reported attending appointments, going shopping in stores, attending church, and using Facebook." (R. 24.) As discussed above, claimant's testimony was that she

relied heavily on her husband and children to perform basic household tasks.  Claimant also testified that she did not attend church and missed appointments because she was unable to get out of bed at times.

The ALJ further found that claimant's overall record showed a lack of consistent psychiatric care or mental therapy and no emergency room hospitalizations.  Ironically, the ALJ found that claimant's attending of appointments was a reason for denying benefits, while also criticizing her lack of appointments for mental health treatment.  Moreover, Vasquez's medical records reflect a long history of medication for depression and anxiety.  Beginning in late 2011, the medical record shows that she did seek long term medical treatment.  Claimant also testified that she could not afford regular care.  "In assessing credibility, infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment.  SSR 96–7p.  However, the ALJ 'must not draw any inferences' about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care."  *Craft*, 539 F.3d at 678.  As discussed above, Vasquez reported that she received psychiatric medication from her general practitioner, but could not afford regular therapy sessions.  The ALJ must take this into consideration before she uses Vasquez's lack of regular treatment as a basis for her mental functioning assessment.

The ALJ's credibility determination and cherry-picking of particular facts not only impacted her assessment of claimant's physical impairments, but also claimant's mental impairments.  More weight was afforded to early statements regarding her limitations and no mention was made of claimant's later testimony and medical records citing her

deteriorating condition.  On remand, claimant's entire record should also be taken into consideration.  *See Myles,* 582 F.3d at 678.

### III.    CONCLUSION

For the reasons set forth above, claimant's request for reversal of the ALJ's motion and the appeals council decision is granted and the Commissioner's motion for summary judgment is denied.  This case is remanded to the Social Security Administration for further proceedings consistent with this opinion.  It is so ordered.


**ENTERED:**

_____
**Michael T. Mason**
**United States Magistrate Judge**


**Dated: September 23, 2015**